Richard A. Frye, Judge.
*400 I. Introduction.
Fifty municipalities from across Ohio brought this suit challenging the constitutionality of portions of Sub. S. B. 331 enacted last December.
All parties agree that the first issue to be considered (among many challenges) is whether the single-subject (or one-subject) rule in Article II, Section 15(D) of the Ohio Constitution was violated by this enactment. The Act passed shortly before last Christmas during the so-called "lame duck" session of the 131st General Assembly. It includes many topics that plaintiffs argue are not a single "subject." The parties provided the court with a stipulation of facts tracking the Act through the legislative process, together with all versions of S.B. 331 as it metastasized. All parties agree that no genuine dispute of material fact exists, and that the question presented is purely one of Ohio constitutional law.
II. The Evolution of S.B. 331.
Initially, S.B. 331 focused only R.C. Ch. 956, and was only intended "to regulate the sale of dogs from pet stores and dog retailers" and to require the Ohio Department of Agriculture "to license pet stores." (Title as introduced in the Senate, May 17, 2016.) Senate passage occurred May 25, and the Bill went to the Ohio House. It languished there until after the 2016 general election. During the so-called "lame duck" session the House Finance Committee added diverse new provisions. Some fixed a statewide minimum wage, and preempted local municipal minimum wage ordinances; others created new statewide rules guaranteeing that the relationship between employees and employers would be solely a matter of private contract or collective bargaining and not subject to local regulation; made cockfighting, bearbaiting, or pitting an animal against another illegal; made sexual conduct between a person and an animal (bestiality) illegal; changed the residency requirement for county humane society agents; made an appropriation for the Agriculture Department and related entities; and substantially rewrote statewide rules for micro-wireless 5G telecommunications equipment. The last subject-regulation of new generation micro-wireless systems-is the focus of concern raised by the fifty plaintiff municipalities in this case.
On December 7, 2016 the Bill passed out of the House Finance Committee. The same day it passed the full House, and the Ohio Senate concurred in the House amendments. In due course it was signed by Governor Kasich.[1] As enacted it was 28 *401 pages in length, without signature pages. The effective date was March 21, 2017.
The portions of S.B. 331 addressed by plaintiffs amended existing statutes in R.C. Chapter 4939, and put in place new provisions addressing how municipalities may interface with new "micro wireless facilities." Such facilities are defined to include "both a distributed antenna system and a small cell facility, and the related wireless facilities." R.C. 4939.01(F). R.C. 4939.02(A)(8) was added to set forth a new finding by the General Assembly that "[i]t is the public policy of this state to *** [e]xpedite the installation and operation of micro, and smaller, wireless facilities in order to facilitate the deployment of advanced wireless service throughout the state."
Among many substantive revisions to this area of Ohio law is R.C. 4939.031(A). It now requires municipal action not later than 90 days after the date of a filing for consent to use a public way to attach micro wireless facilities to a support structure. R.C. 4939.031(B) now provides that a municipality "shall not require any zoning or other approval, consent, permit, certificate, or condition for the construction, replacement, location, attachment, or operation of a micro wireless facility, or otherwise prohibit or restrain the activities as described in this section." Beyond that, R.C. 4939.032 states that "[a] micro wireless facility operator may construct and operate the facility in a public way, subject to this chapter" while the next following section (4939.033) provides that "[a] request for consent under section 4939.031 of the Revised Code shall be deemed a permitted use and shall be exempt from local zoning review." Other new provisions preclude a municipality from requiring a telecommunications provider "justify the need for the new micro wireless facility," or "[e]valuate the request based on the availability of other potential locations for the placement of the micro wireless facility or associated wireless support structure;" or condition consent on "purchase, lease, or use of facilities, networks, or services owned or operated by the municipal corporation." R. C. 4939.0315 (C), (D) and (J).
Under S.B. 331, Ohio municipalities are precluded from imposing "separation requirements that require any space to be maintained between wireless facilities or wireless support structures" and stopped from preventing installation of such facilities and structures "in a residential area or within a specific distance from a residence or other structure." Id. at (P) and (Q). Further restrictions on municipal authority include R.C. 4939.0325(A), which eliminates the right of a municipal corporation to block "an attachment by a micro wireless facility operator to a wireless support structure owned or operated by the municipal corporation and located in the public way."
It is undisputed that S.B. 331 addresses a wide variety of topics. However, as discussed below, a law must be upheld under the one-subject rule so long as, despite a diversity in topics, one common, unifying subject or purpose ties all the topics together. Here, both the State and intervening defendant CTIA-The Wireless Association argue that the common thread or purpose behind S.B. 331 was elimination of a "patchwork quilt of differing municipal regulations scattered across the state," to thereby "ensuring uniform statewide regulation of certain business activities that would otherwise be harmed by fragmented and burdensome municipal regulation." Conversely, both the Humane Society of the United States as amicus and the plaintiff municipalities contend that the primary *402 purpose of this Act can only be seen as the protection of animals through regulation of dog sales, licensing of pet stores, and ancillary provisions criminalizing bestiality, authorizing impoundment of an animal believed to be the subject of such an offense, and blocking bearbaiting and animal fighting. To that might be added the appropriation of approximately $75 million for programs involving animal health and food safety through the Agriculture Department, county Agricultural Societies, and Soil and Water Districts in the Western Lake Erie Basin. (§ 3 of S.B. 331, at pp. 23-27.) Similarly, the modest amendment to existing R.C. 1717.06 eliminating residency requirements for agents of county humane societies fits within the broader purpose of protecting animals, and has nothing to do with simplifying business regulation.
III. The One-Subject Provision.
Article II, Section 15 of the Ohio Constitution is entitled "How bills shall be passed." It regulates the procedures used by the legislature in adopting or amending laws, rather than authorizing or restricting legislative action on any particular subject matter.
Section 15 (D) provides in relevant part: "No bill shall contain more than one subject, which shall be clearly expressed in its title." This Constitutional provision was first adopted in 1851. The history of this provision, which is similar to those in some 41 other states, is detailed in scholarly work. E.g. , Hoffer, Symposium: The Ohio Constitution-Then and Now: An Examination of the Law and History of the Ohio Constitution *** Ohio's One-Subject Rule and the Very Evils it was Designed to Prevent, 51 Cleve. St. L. Rev. 557 (2004); Schuck, Comment: Returning the "One" to Ohio's "One-Subject" Rule , 28 Cap. L. Rev. 899 (2000); Kulewicz, The History of the One-Subject Rule of the Ohio Constitution , 45 Cleve. St. L. Rev. 591 (1997).
In 1984 the Supreme Court discarded the view that the one-subject rule in Section 15(D) was "merely directory rather than mandatory" and recognized that situations could exist in which the rule will invalidate a legislative enactment.
The mere fact that a bill embraces more than one topic is not fatal, as long as a common purpose or relationship exists between the topics. However, where there is a blatant disunity between topics and no rational reason for their combination can be discerned, it may be inferred that the bill is a result of log-rolling-the practice by which several matters are consolidated in a single bill for the purpose of obtaining passage for proposals which would never achieve a majority if voted on separately. This is the very practice which Section 15(D) was designed to prevent.
Hoover v. Bd. of Franklin Cty. Commrs. , 19 Ohio St.3d 1, 6, 482 N.E.2d 575 (1985) citing State ex rel. Dix v. Celeste , 11 Ohio St.3d 141, 464 N.E.2d 153 (1984).
In a concurring opinion, Justice Holmes-"a [self-described] member of the General Assembly for a number of years"-acknowledged that the "court's previous renditions to the effect that *** [ Section 15 (D) ] shall be viewed as directory, rather than mandatory, have been misinterpretations of the Constitution." 19 Ohio St.3d, at 7-8, 482 N.E.2d 575. In moving away from historical antagonism toward the one-subject rule, the Court treated Section 15 (D) in essentially the same manner as other provisions in the Constitution.[2]
*403 State ex rel. Dix, supra , characterized the one-subject rule as "disallowing unnatural combinations of provisions in acts" so that each "bill will have unity and thus the purpose of the provision [in Section 15(D) ] will be satisfied." 11 Ohio St.3d, at 143, 464 N.E.2d 153. "The resultant effect of the one-subject provision is a more orderly and fair legislative process *** [in which] the issues presented can be better grasped and more intelligently discussed." Id.
State ex rel. Ohio Academy of Trial Lawyers v. Sheward , 86 Ohio St.3d 451, 465, 715 N.E.2d 1062 (1999) reviewed the history of the provision and concluded that "[j]ust as the Constitution of 1802 had reflected an aversion to an all-powerful executive, so the Constitution of 1851 was inspired by an antipathy toward an all-powerful legislature and a desire for more independence of each branch of our tripartite system of government." Among the "concrete limits on the power of the General Assembly to proceed however it saw fit in the enactment of legislation" adopted with the 1851 Constitution was the one-subject rule. Id. at 495, 715 N.E.2d 1062. Sheward then applied the provision to invalidate a massive tort reform bill, finding that even a liberal view of the term "subject" could not be extended to cover all of the Act in question because it included "blatantly unrelated matters." In so holding, the Court recognized that "we are not obliged to accept that any ingenious comprehensive form of expression constitutes a legitimate subject for the purposes of the one-subject rule." Id. at 498, 715 N.E.2d 1062.
These [one-subject] cases can be perceived as points along a spectrum. At one end, closely related topics unite under a narrowly denominated subject. As the topics embraced in a single act become more diverse, and as their connection to each other becomes more attenuated, so the statement of subject necessary to comprehend them broadens and expands. There comes a point past which a denominated subject becomes so strained in its effort to cohere diverse matter as to lose its legitimacy as such. It becomes a ruse by which to connect blatantly unrelated topics. At the farthest end of this spectrum lies the single enactment which endeavors to legislate on all matters under the heading of "law."
Id. at 499, 715 N.E.2d 1062.
A number of one-subject decisions have been issued by Ohio appellate courts in recent years. Last year in State ex rel. Ohio Civil Serv. Employees Ass'n v. State , 146 Ohio St.3d 315, 2016-Ohio-478, 56 N.E.3d 913, ¶ 16, for example, the court reaffirmed that Section 15 (D) is a "mandatory" legal rule, even though the courts' "role in its enforcement remains limited" in order to "accord appropriate deference to the General Assembly's law-making function." The standard applied recognized "there are rational and practical reasons for the combination of topics on certain subjects *** as long as they are germane *404 to a single subject *** for the purposes of bringing greater order and cohesion to the law or of coordinating an improvement of the law's substance." Id. ¶ 17. That OCSEA decision concluded that a state appropriations bill which included prison-privatization did not violate the one-subject rule, because all "provisions relate to the overall subject of state expenditures and revenues *** balancing state expenditures against state revenues to ensure continued operation of state programs." ¶¶ 26-27.[3]
This is not the first time that the General Assembly has addressed R.C. Ch. 4939 and telecommunications in a manner which triggered a municipal challenge under the one-subject rule. In 1999 provisions limiting how municipalities could control the use of their own "public ways" were included in the 855 page biennial appropriations bill. The cities of Upper Arlington and Dublin sued, and obtained a declaratory judgment in this court that the legislative effort violated the one-subject rule. City of Dublin v. State , 118 Ohio Misc.2d 18, 769 N.E.2d 436 (Franklin Co. C.P.2002) (Hogan, J.). Counsel have advised this court that Judge Hogan's decision was not appealed, but that in the wake of his decision new statutes were negotiated by interested parties and ultimately enacted by the General Assembly.
IV. Analysis.
The breadth of S.B. 331 violates the one-subject rule. Again, matters addressed in this single piece of legislation include criminalizing certain conduct, regulating pet stores and dog retailers, restricting how municipalities may regulate terms and conditions of work, or the minimum wage to be paid workers; and the regulation of a new generation of micro wireless facilities, including equipment placed on municipal property. Although defendants argue that most of S.B. 331 fits neatly under an overarching theme of eliminating a patchwork quilt of municipal business regulations, even that generous view of the "subject" fails to capture all this diversity. Furthermore, were a court to accept that broad concept of a single "subject" it would eviscerate the Constitutional rule. The defendants' position would also leave open difficult controversies under other, core provision in the Ohio Constitution, most notably the guarantee of Home Rule authority to municipalities. Article XVIII, Section 3.[4]
The lack of a single unifying subject in S.B. 331 was candidly conceded by the CTIA in oral argument. Bestiality and animal fighting prohibitions were acknowledged to share nothing in common with the wide-ranging, perhaps revolutionary telecommunications provisions, or with statewide minimum wage and working conditions statutes. From that perspective it has been creatively argued that this court should conclude S.B. 331 is primarily concerned with unifying rules on business subjects, leaving as outliers invalid under the one-subject rule all of the animal-related provisions. In the view of the utility *405 association those are the provisions in S.B. 331 that should be severed and discarded.
Given the history of S.B. 331 and the diversity of material included within it, the court finds that position disingenuous. S.B. 331 passed the Senate initially to protect puppies. Nothing in the record before the court suggests that the broad telecommunications provisions now in focus were given formal hearings in either chamber. Instead, in the rush to conclude the lame duck session, S.B. 331 passed out of the House Finance Committee, and was approved on the floor of both the House and Senate all on the same day. Hasty consideration of such a diverse assortment of subjects directly undermines the policy underlying the one-subject rule, which is to encourage a more orderly and fair legislative process. Dix, supra , at 143, 464 N.E.2d 153.
While the court has not been asked to simultaneously decide other constitutional questions before resolving the one-subject challenge, the existence of serious questions about the substantive constitutionality of provisions in S.B. 331 cannot simply be ignored. A well-settled rule in constitutional cases holds that courts should seek to avoid giving legislation a construction that raises constitutional doubt when another reading is available. This is called the doctrine of constitutional avoidance. "Modern avoidance holds that constitutional doubts are enough to trigger the canon, without any need to adjudicate actual unconstitutionality." Katyal and Schmidt, Active Avoidance: The Modern Supreme Court and Legal Change, 128 Harv. L. Rev. 2109, 2117 (2015). While the avoidance doctrine cannot be applied here, because these telecommunications provisions are being challenged under both the one-subject provision and other provisions in the Ohio Constitution, the wisest course is to accept the implications of the one-subject rule. That may avoid-perhaps forever-the need for rulings on the other issues, including most notably Home Rule and "taking" of municipal property.
The interface between state government authority and Home Rule municipalities in the context of utility regulation is complicated. It has been repeatedly litigated since the adoption of Article XVIII in 1912. See, e.g. , Vaubel, Of Concern to Painesville-or Only to the State: Home Rule in the Context of Utilities Regulation , 33 Ohio St. L.J. 257 (1972) (collecting cases over the first 60 years under Home Rule). S.B. 331 not only sets forth rules on how permits and other regulation of telecommunications are to be handled but appears to permit physical use of municipal property without the consent of municipal owners.[5] All of this raises knotty issues.
As occurred when Judge Hogan decided the Dublin case 15 years ago, invalidating this law under the one-subject rule is not only the correct Constitutional decision, but practically speaking may bring the General Assembly, telecommunications providers, and Ohio municipalities together to constructively revisit all these issues through formal legislative hearings and informal discussion. That process, which the one-subject rule is intended to assure, is *406 the best opportunity to see telecommunications statutes that avoid serious question under any provision of the Ohio Constitution.
Fostering good legislation is the reason the Ohio Constitution contains a one-subject provision, and why it requires a single subject to be "clearly expressed in its title." Here, a blatant disunity exists between matters engrafted at the last minute on to S.B. 331. No rational reason for their combination can be discerned. A constitutional violation has been demonstrated.
V. The Remedy.
Sheward , supra at 500, 715 N.E.2d 1062, discussed "the authority to sever portions of an act that violate the one-subject rule in order 'to cure the defect and save the portions which do relate to a single subject.' " To use this remedy, a court "is permitted to ascertain which subject is primary and which subject is an unrelated add-on. The former is then saved by severing the latter." Id. Recently decisions in State v. Aalim , 150 Ohio St.3d 463, 2016-Ohio-8278, 83 N.E.3d 862, at ¶ 29, vacated on reconsideration on other grounds 150 Ohio St.3d 489, 2017-Ohio-2956, 83 N.E.3d 883, and Cleveland v. State , 138 Ohio St.3d 232, 2014-Ohio-86, 5 N.E.3d 644, at ¶ 18 recognized the value of severing any portion of an act which is unconstitutional, while preserving the balance.
S.B. 331 itself counsels this course. Uncodified Section 6 of the Act provides that "[i]f any item of law *** contained in this act *** is held invalid, the invalidity does not affect other items of law or applications of items of law that can be given effect without the invalid item of law or application. To this end *** sections of law contained in this act are composed, and their applications, are independent and severable."
Ohio law recognizes a well-settled rule that when an unconstitutional statute replaced a prior version of the same law, the repeal of the earlier statute generally is deemed invalid. Ordinarily then, it is as if the offending new statute never had been passed. State v. Sullivan , 90 Ohio St.3d 502, 739 N.E.2d 788 (2001), syllabus paragraph two, held:
When a court strikes down a statute as unconstitutional, and the offending statute replaced an existing law that had been repealed in the same bill that enacted the offending statute, the repeal is also invalid unless it clearly appears that the General Assembly meant the repeal to have effect even if the offending statute had never been passed. ( State ex rel. Pogue v. Groom [1914], 91 Ohio St. 1, 109 N.E. 477, paragraph three of the syllabus, approved and followed.)
Sullivan is among a number of decisions recognizing this principle. State v. Parker , 150 Ohio St. 22, 24, 80 N.E.2d 490 (1948) ; Morton v. State , 105 Ohio St. 366, 138 N.E. 45 (1922), syllabus paragraph 2 and cases cited; State ex rel. Walton v. Edmondson , 89 Ohio St. 351, 106 N.E. 41 (1914), syllabus paragraph three; State ex rel. Wilmot v. Buckley , 60 Ohio St. 273, 54 N.E. 272 (1899), syllabus paragraph four.
To determine whether a repealing clause is inoperative in this context, court decisions focus upon whether it "clearly" would have been the "expressed intention" of the legislature to change prior law if it were known the substitute, new law were invalid. That is a demanding test. When no such clarity exists, the default rule is that repealing-language is deemed inoperative so the old version of the statute remains in effect.
No clear legislative intent is evident here relative to elimination of the previous version of R.C. Ch. 4939 that *407 regulated telecommunications systems in Ohio, or of other statutes improperly altered by S.B. 331 in violation of the one-subject rule. Accordingly, pursuant to the doctrine recognized in the Sullivan line of cases the prior versions of Chapter 4939 and of other statutes addressing subjects (other than those touching on protection of animals) as they existed before S.B. 331 retain full force and effect. The specific statutes that are invalid and those that remain in force consistent with the single subject in S.B. 331 are set forth more fully in the Judgment being entered separately by the court. That Judgment includes Civ. R. 54(B) language in the event any party seeks an immediate appeal.
VI. Conclusion.
Some years ago, Ohio Chief Justice C. William O'Neill offered the following observation about the importance of following a constitution:
If the members of a legislative body can ignore, with impunity, the mandates of a constitution ***, then it is certain that the faith of the people in constitutional government will be undermined and eventually eroded completely.
Cleveland ex rel. Neelon v. Locher , 25 Ohio St.2d 49, 52, 266 N.E.2d 831 (1971).
Much more recently, one of Ohio's leading newspapers editorially disparaged the manner in which the one-subject rule appears to be enforced:
Technically, such add-ons also violate the one-subject rule in Ohio's Constitution. But that's a legal requirement so routinely ignored, and so loosely interpreted by the Ohio Supreme Court, that it's become almost meaningless.
Editorial, Lawmakers should nix these bad ideas ," Cleveland Plain Dealer, Friday May 12, 2017, at p. E2.
As demonstrated above, the one-subject rule retains not only a place in the Ohio Constitution, but also vitality in Ohio courts. Chief Justice O'Neill correctly recognized that the faith of the people in constitutional government demands nothing less.
Plaintiffs' motion for summary judgment on their First Claim is GRANTED and the cross-motions by defendants are DENIED . The court finds and declares that the portions of S.B. 331 which amended R.C. 4111.02, enacted R.C. 4113.85, and amended Ch. 4939 are unconstitutional, and must be severed, leaving as valid all provisions in Ch. 956 which, generally speaking, address animal welfare and protection; the provisions in R.C. 959.15, .21, and .99 addressing, in general, cockfighting, bearbaiting, wagering on fighting between one animal and another, sexual conduct between a human and an animal, and remedies for such misconduct; the residency criteria for county humane society agents in R. C. 1717.06 ; and the financial appropriation in Section 3 of the Bill for the Department of Agriculture and related entities. The repeal of statutes in Ch. 4939, and of R.C. 4111.02 (by Section 2 of S.B. 331) is deemed invalid under Sullivan, supra ; the statutory provisions in effect on March 20, 2017 therefore remain in force.
IT IS SO ORDERED.

The final version included the following topics, as set forth in the title of the Act:
*** to regulate the sale of dogs from pet stores and dog retailers, to require the Director of Agriculture to license pet stores, and to revise the civil penalties applicable to dog breeders and other specified entities; to govern construction and attachment activities related to micro wireless facilities in the public way; to prohibit political subdivisions from establishing minimum wage rates different from the rate required by state law; to generally grant private employers exclusive authority to establish policies concerning hours and location of work, scheduling, and fringe benefits, unless an exception applies; to prohibit a person from engaging in sexual conduct with an animal and related acts, to provide for the seizure and impoundment of an animal that is the subject of a violation, and to authorize a sentencing court to require an offender to undergo psychological evaluation or counseling; to prohibit and establish an increased penalty for knowingly engaging in activities associated with cockfighting, bearbaiting, or pitting an animal against another; to remove the residency requirement for the appointment of an agent to a county humane society; and to make an appropriation.

"Ordinarily, language used in the Constitution is given its 'usual, normal, or customary meaning.' State ex rel. King v. Summit County Council , 99 Ohio St.3d 172, 2003-Ohio-3050, 789 N.E.2d 1108, ¶ 35 ; Toledo Edison Co. v. City of Bryan (2000), 90 Ohio St.3d 288, 292, 737 N.E.2d 529. In general, Ohio courts use the same rules of interpretation for interpreting the Constitution as are used for interpreting statutes. Therefore, 'if the meaning of a provision cannot be ascertained by its plain language, a court may look to the purpose of the [constitutional] provision to determine its meaning.' State v. Jackson , 102 Ohio St.3d 380, 2004-Ohio-3206, 811 N.E.2d 68, ¶ 14, citing Castleberry v. Evatt, 147 Ohio St. 30, 67 N.E.2d 861 (1946), paragraph one of the syllabus."
State v. Rodgers , 131 Ohio Misc.2d 1, 2005-Ohio-1730, 827 N.E.2d 872, ¶¶ 18-19 (Franklin Co. C.P.)aff'd 166 Ohio App.3d 218, 2006-Ohio-1528, 850 N.E.2d 90 (10th Dist.)

The Supreme Court currently has before it a one-subject case involving health care facilities that perform abortions. Capital Care Network of Toledo v. State Dept. of Health , 6th Dist., 2016-Ohio-5168, 58 N.E.3d 1207, discretionary appeal allowed Case No. 2016-1348, 148 Ohio St.3d 1425, 2017-Ohio-905, 71 N.E.3d 297. The appellate court concluded that inclusion of provisions on licensing abortion facilities in the otherwise massive statewide biennial budget bill offered "no common nexus" contrary to the one-subject rule. Id. at ¶ 42.

"Municipalities shall have authority to exercise all powers of local self-government and to adopt and enforce within their limits such local police, sanitary and other similar regulations, as are not in conflict with general laws."

According to the complaint, these 50 municipalities participate in this case as property owners, not merely in their municipal governing status. Under the Ohio Constitution, property rights are deemed to be "fundamental rights." As such "[t]here can be no doubt that the bundle of venerable rights associated with property is strongly protected in the Ohio Constitution and must be trod upon lightly, no matter how great the weight of other forces." City of Norwood v. Horney , 110 Ohio St. 3d 353, 2006-Ohio-3799, 853 N.E.2d 1115, ¶ 38. This serious issue also demonstrates the need for much fuller consideration in the General Assembly.